UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NATHAN WILLIAMS,

                    Plaintiff,

    v.                                          Case No. 20-cv-1659-pp

DILIP TANNAN, DORRIE HANSEN
and CINDY O'DONNELL,

                    Defendants.

---

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 38), DENYING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(DKT. NO. 39), GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 43)**

---

Plaintiff Nathan Williams, who is representing himself, is proceeding under 42 U.S.C. §1983 on Eighth Amendment claims against officials at Oshkosh Correctional Institution. Both parties have moved for summary judgment. Dkt. Nos. 38, 43. The plaintiff also has moved for default judgment. Dkt. No. 39. The court will deny the plaintiff's motions for summary judgment and default judgment, grant the defendants' motion in part and deny it in part and dismiss defendants Dorrie Hansen and Cindy O'Donnell.

**I.     Facts**

    A.     <u>Procedural Background</u>

On November 2, 2020, the court received the plaintiff's complaint alleging that several officials at Oshkosh had provided inadequate medication to treat his pain and wrongly dismissed his grievances about his medical treatment. Dkt. No. 1. The court screened the complaint, dismissed all but three of the defendants

and allowed the plaintiff to proceed on Eighth Amendment claims related to his allegedly inadequate medical treatment and one defendant's "blind dismissal" of the plaintiff's grievance about that treatment. Dkt. No. 10.

On July 27, 2022, the court issued a scheduling order setting deadlines of December 30, 2022 for the parties to complete discovery and January 30, 2023, for the parties to file dispositive motions. Dkt. No. 16. On November 9, 2022, the court received from the plaintiff a motion to compel, asserting that the defendants had not responded to his discovery requests. Dkt. No. 24. In a text-only order dated December 29, 2022, the court denied that motion because the plaintiff had filed it prematurely; the defendants timely had responded to his discovery requests within the requisite sixty-day period. Dkt. No. 31. But the court extended the parties' deadlines to complete discovery to February 13, 2023 and to file dispositive motions to March 15, 2023. Id.

On January 18, 2023, the court received from the plaintiff a motion for sanctions, in which he asserted that the defendants had provided incorrect copies of his medical records and had failed to correct their disclosures. Dkt. No. 33. He claimed that the defendants eventually had "hand[ed] over the damaging evidence" when they determined that he "was closing in" on obtaining it on his own. Id. at 3. The plaintiff sought damages for the defendants' alleged wrongdoing and demanded to proceed directly to trial or, alternatively, demanded the full relief he demanded in his complaint—$750,000. Id. at 5. The plaintiff also asked for additional time to conduct discovery before filing dispositive motions, and the defendants did not oppose that request. Dkt. No. 60 at 4–5. But on February 21, 2023, the court received the plaintiff's motions for summary judgment and for

default judgment. Dkt. No. 38, 39. The court granted the defendants' motion to file, by March 24, 2023, a combined brief both in response to the plaintiff's motion for summary judgment and in support of their own motion for summary judgment. Dkt. No. 41. At the March 24, 2023 deadline, the defendants filed their combined motion and response. Dkt. No. 43. On April 27, 2023, the court received from the plaintiff a motion "to correct any mistakes" he made in his filings before the court ruled on the motions for summary judgment. Dkt. No. 55. He also filed a declaration in support of his motion for summary judgment. Dkt. No. 56. On June 5, 2023, the court denied the motion as unnecessary and assured the plaintiff that it would consider his declaration and consider his pleadings with leniency because he is a *pro se* litigant. Dkt. No. 59.

On May 15, 2023, the plaintiff filed a "Response to Defendants Reply Brief in Support of Motion for Summary Judgment," which responds to the defendants' reply brief, disputes the assertions in that reply brief and asserts that the court should deny the defendants' motion for summary judgment. Dkt. No. 58. In effect, the plaintiff's filing is a sur-reply to the defendants' reply brief. Neither the Federal Rules of Civil Procedure nor this court's Civil Local Rules provide for sur-replies, and the plaintiff did not ask the court for permission to file it. "'The decision to permit the filing of a sur-reply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief.'" Watt v. Brown County, 210 F. Supp. 3d 1078, 1082 (E.D. Wis. 2016) (quoting Meraz-Camacho v. United States, 417 F. App'x 558, 559 (7th Cir. 2011)). The defendants did not raise new arguments in their reply brief— they responded to the plaintiff's brief in opposition and asserted that he had

failed to comply with the Local Rules and to propose facts warranting denial of their motion for summary judgment. The plaintiff's sur-reply disputes that position; it does not assert that the defendants raised new arguments justifying an additional reply. The court will not consider the plaintiff's sur-reply when analyzing the parties' arguments.

On June 8, 2023, the court denied the plaintiff's motion for sanctions (Dkt. No. 33) because the defendants' response made clear that they did not intentionally withhold information or attempt to conceal the plaintiff's medical records, providing them to him as soon as they could after a delay in processing a request for his records. Dkt. No. 60. But the court told the plaintiff that he could notify the court if he had any further discovery demands before the court would rule on the motions for summary judgment. Id. at 7–8. On June 14, 2023, the plaintiff notified the court that he had no "further argument or any further discovery request," and he "ask[ed] the court to move forward with the other motions." Dkt. No. 61.

The motions for summary judgment are fully briefed and ready for the court's ruling. Although the plaintiff disagrees with some of the defendants' proposed findings of fact, he has not supported many of those disagreements by citing evidence in the record. He did not file his own proposed findings of fact. His brief in support of his motion for summary judgment contains numbered statements that could be proposed facts, and he later filed a declaration that the court will consider, as explained in the previous order. Dkt. No. 59. But he has not properly disputed many of the defendants' proposed facts. The court will deem admitted any of the defendants' proposed facts with which the plaintiff

disagrees but which he did not support with citations to record evidence, as the court's Local Rules require. See Civil Local Rule 56(b)(4) (E.D.Wis.); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission."). That means that for any proposed fact that the plaintiff does not properly dispute with citations to evidence in the record, the court will consider that fact undisputed so long as the defendants support the proposed fact by citing evidence in the record. See Federal Rule of Civil Procedure 56(c)(1); Civil L.R. 56(b)(1)(C)(i) and (2)(B)(i)–(ii); Jenkins v. Syed, 781 F. App'x 543, 545 (7th Cir. 2019).

B.     Factual Background

At all relevant times, the plaintiff was incarcerated at Oshkosh. Dkt. No. 45 at ¶1. Defendant Dilip Tannan is employed as a physician with the Wisconsin Department of Corrections (DOC) and has been in that position since July 8, 2022. Id. at ¶2. Before that, from November 2, 2015, through July 7, 2022, Dr. Tannan worked as a physician at Oshkosh. Id. Defendant Dorrie Hansen is the Assistant Health Services Manager at Dodge Correctional Institution; she previously worked as a Nurse Clinician at Oshkosh. Id. at ¶3. Defendant Cindy O'Donnell is a Policy Initiatives Advisor with the DOC. Id. at ¶4. She also serves as the Secretary's designee and makes final agency decisions on complaints that incarcerated persons file through the Inmate Complaint Review System. Id.

1.     The Health Services Unit and Health Services Requests

Incarcerated persons seeking an appointment with medical staff in the Health Services Unit (HSU) must fill out and file a Health Services Request form (HSR). Id. at ¶5. The incarcerated person must check the box on the form labeled

"Health Services" and describe the medical issue for which he wishes to be seen. Id. Incarcerated persons who seek only information must check the box on the form labeled "Information." Id.

Prison staff collect HSRs from housing units daily, and nursing staff triage those requests, ideally within twenty-four to forty-eight hours of receipt. Id. at ¶¶7–8. Nursing staff schedule appointments based on the symptoms the incarcerated person describes in the HSR. Id. at ¶9. If nursing staff determine that an incarcerated person's reported symptoms are non-urgent, they will schedule the incarcerated person for an appointment as soon as possible. Id. at ¶10. The date of that appointment depends on staff availability, urgency of the medical problem, the number of other patients requiring urgent medical care and other factors. Id. at ¶11. If the triaging nurse determines that an incarcerated person's described symptoms are urgent, the nurse will schedule him to see a nurse that day. Id. at ¶12. These are called "nursing sick call" appointments, and the nurse conducting the sick call usually schedules the appointment in the morning or afternoon during first or second shift. Id. at ¶14. Nursing staff may not always be able to see a patient the same day based on staff and patient needs. Id. Nurse Hansen avers that when she scheduled nursing sick call appointments as a nurse clinician, she would send a copy of the incarcerated person's HSR to a Medical Program Assistant Associate to initiate a medical record review with the incarcerated person/patient. Id. at ¶13. The associate would pull the incarcerated person's chart for the nurse conducting the sick call, and the nurse would schedule an appointment accordingly. Id.

A triaging nurse also may "escalate" the appointment and schedule a visit with an Advanced Care Provider, which could be a doctor, nurse practitioner or advanced practice nurse prescriber. Id. at ¶15. Hansen avers that if she determined that an incarcerated person's reported symptoms might be serious, it was her practice to pull that incarcerated person's medical chart, add the incarcerated person to an Advanced Care Provider's list for the day and provide the reason for the appointment. Id. The provider then would decide whether the incarcerated person's symptoms warranted a same-day or next-day visit. Id. Hansen says that a triaging nurse rarely responds to an incarcerated person's HSR the same day he submits that request. Id. at ¶17.

Each incarcerated person has an emergency call button his cell. Id. at ¶19. Pressing the button immediately alerts security staff, which includes correctional officers, sergeants, lieutenants and captains. Id. During an incarcerated person's first day at Oshkosh, the HSU gives him information on what it considers an emergency and how to contact the HSU and security staff in the event of an emergency. Id. at ¶18. If an incarcerated person experiences life-threatening symptoms, he knows to alert security staff using the intercom button in his cell. Id. Hansen avers that pressing the intercom button or speaking with security staff is the fastest way for the incarcerated person to receive care. Id. at ¶17. If the incarcerated person calls security staff about a medical emergency, security staff notifies the HSU so medical staff can immediately respond to the incarcerated person and report to his cell. Id. at ¶20. The reporting nurse typically checks the incarcerated person's vital signs, conducts a patient

7

assessment and, if the nurse concludes that the incarcerated person's condition requires immediate care, requests security staff to call paramedics. Id.

Hansen avers that she added the plaintiff to the Advanced Care Provider's list to be seen but does not specify when she added him to that list. Dkt. No. 47 at ¶21. She says that as a nurse clinician, she could not presume what the provider would believe, could not presume what his or her schedule would allow and had to defer to the provider's decision. Id. at ¶20. The plaintiff asserts that Hansen must have made the decision not to treat him as an emergent symptoms patient and should have assigned a nursing sick call appointment before placing him on the provider's list. Dkt. No. 51 at ¶16. He cites a DOC prison policy that generally describes the responsibilities of on-call nurses. Id.; Dkt. No. 51-1 at 36.

>    2.    *The Plaintiff's Medical Treatment at Oshkosh*

>        a.    September 21, 2015 Appointment

On September 21, 2015, the plaintiff had a nursing sick call appointment with a non-defendant nurse for recurrent pain in his stomach, back and chest. Dkt. No. 45 at ¶21; Dkt. No. 49-1 at 1. The plaintiff reported having "pain everywhere," and he described the pain as "sharp," recurrent and radiating. Dkt. No. 49-1 at 1–2. He denied having pain at the time of the appointment, but he said that the pain "[could] come any time of day," had been "on [and] off for 6 months" and affected his sleep. Id. The nurse reported that the plaintiff was "cooperative with steady gait." Id. She reported that he was "nondiaphoretic," meaning not sweaty, and was "not in acute distress at this time." Id. The plaintiff's abdomen was non-distended, flat and soft. Id. The plaintiff's vitals were in normal limits, and he showed no apparent gastrointestinal abnormalities. Id.

The nurse concluded that the plaintiff was suffering from radiating abdominal pain that was possibly causing his discomfort. Id. at 2; Dkt. No. 45 at ¶29. The nurse gave the plaintiff a handout for reducing his stress and relaxing that included breathing techniques he could use during pain episodes. Dkt. No. 49-1 at 2. She also instructed the plaintiff to consume more fluids and referred her findings to an Advanced Care Provider. Id. The nurse did not recommend a nursing follow-up appointment. Id.

Hansen avers that the nurse's findings and recommendations confirmed that the plaintiff's condition on September 21, 2015 was not serious. Dkt. No. 47 at ¶42. She says that if the nurse had determined that his condition was serious, she would have scheduled him for a nursing follow-up, an appointment with an Advanced Care Provider or an offsite provider visit. Id. The plaintiff contests this statement and says it is not known "why the nurse did not set up an appointment." Dkt. No. 51 at ¶32.

b.    October 2015

Hansen avers that in October 2015, she generally worked third shift, from 10:00 p.m. to 6:00 a.m., and was responsible for triaging HSRs from incarcerated persons. Dkt. No. 47 at ¶¶43–44. On October 7, 2015, the plaintiff submitted an HSR complaining about the pain in his abdomen, chest and back. Dkt. No. 49-1 at 3. He said that the pain was "still killing" him, and he asked "to be checked out as soon as possible." Id. Hansen received the plaintiff's HSR the next day. Id. She says she reviewed his request and pulled up his medical chart to review his medical history, medications and upcoming appointments. Id.; Dkt. No. 47 at ¶46. Hansen noted that the plaintiff had been seen for the September 21, 2015

9

nursing sick call, so she reviewed the nurse's notes from that appointment. Dkt. No. 47 at ¶47. Hansen believed the plaintiff's HSR concerned the same symptoms he had reported during the September 21, 2015 appointment, which she says led her to believe that his pain "was a chronic condition." Id. at ¶49.

Hansen reviewed the plaintiff's record to confirm whether he had been compliant with any medications related to his complaints of pain. Dkt. No. 45 at ¶38. She also looked to see if he had refused medical care, medications, offsite visits or appointments. Id. She reviewed his previous HSRs to determine if there was a pattern to his complaints. Id. Based on the information in the plaintiff's medical chart and his recent appointment for a similar issue, Hansen concluded that his condition did not warrant immediate care. Id. at ¶39. She believed the plaintiff was "complaining about an ongoing issue rather than an acute medical emergency," and she interpreted his HSR as a request to see a nurse for his ongoing symptoms rather than for a change in his condition. Dkt. No. 47 at ¶52.

The plaintiff's chart showed that he was scheduled for an appointment with Dr. Philip Wheatley (not a defendant) on October 26, 2015. Dkt. No. 45 at ¶40. Hansen responded to the plaintiff's HSR by noting his scheduled appointment and adding that he could ask to be seen by a nurse if he had any "significant change in pain." Id.; Dkt. No. 49-1 at 3. The plaintiff asserts that Hansen's course of action violated prison policies, but he does not cite specific pages of the record that contain the policies he believes she violated. Dkt. No. 51 at ¶39.

On October 26, 2015, the plaintiff saw Dr. Wheatley for testing of the plaintiff's blood, stool, urine and abdomen via an ultrasound. Dkt. No. 45 at ¶44.

Dr. Wheatley addressed the plaintiff's concerns of pain and scheduled him for a follow-up appointment in mid-December 2015. Id.; Dkt. No. 49-1 at 4.

c. Tests and Appointment in March 2016

Dr. Tannan first treated the plaintiff on March 17, 2016. Dkt. No. 45 at ¶45. Tannan avers that he was the third doctor to see the plaintiff for his abdominal pain since 2015. Id.; Dkt. No. 46 at ¶8. Tannan notes that stomach ulcers can cause internal bleeding, lead to a low blood count and cause blood to appear in a patient's stool. Id. at ¶9. On March 24, 2016, the plaintiff underwent a Fecal Blood Occult Test, which came back negative for blood in his stool. Id. at ¶10; Dkt. No. 49-2 at 6. Dr. Tannan concluded that the plaintiff did not have a stomach ulcer. Dkt. No. 46 at ¶11.

d. March 3, 2017 Appointment

On March 3, 2017, Dr. Tannan saw the plaintiff for a follow-up. Dkt. No. 45 at ¶48. Progress notes from this appointment show that the plaintiff continued "to have weight symptoms of acid reflux epigastric discomfort going up into the chest." Id.; Dkt. No. 49-2 at 3. Dr. Tannan clarifies that "weight symptoms" is a typo; he meant to write "vague symptoms." Dkt. No. 46 at ¶13. Dr. Tannan noted that the plaintiff's pain was "not exertion related" because he was "able to exercise and lift weights [and] play[] basketball" without symptoms. Dkt. No. 49-2 at 3. Dr. Tannan says this allowed him to rule out a cardiac-related problem. Dkt. No. 46 at ¶14. Dr. Tannan recounted that a previous "extensive workup CT scan on January 04, 2016 was negative" and showed no abnormalities in the plaintiff's stomach, intestines or urinary system. Id. at ¶15; Dkt. No. 49-2 at 3. Dr. Tannan noted that the plaintiff's bladder residual was normal and showed no sign of

urine retention after urination, which can cause abdominal pain. Dkt. No. 46 at ¶16; Dkt. No. 49-2 at 3. He also noted that the plaintiff's labs performed the previous year were normal and showed no indication of pancreatitis. Dkt. No. 46 at ¶17; Dkt. No. 49-2 at 3. The plaintiff denied vomiting, diarrhea, rectal bleeding or change in his weight or appetite, and his vitals were normal. Dkt. No. 46 at ¶¶18–19; Dkt. No. 49-2 at 3. His abdomen was not extended, which ruled out a potential bowel obstruction. Dkt. No. 46 at ¶20; Dkt. No. 49-2 at 3. Nor did the plaintiff have tenderness in his epigastrium—the center part of the abdomen below the ribs—which can be a sign of an ulcer. Dkt. No. 46 at ¶21; Dkt. No. 49-2 at 3. The plaintiff was not tender in the renal angle, which can be a sign of a kidney infection or kidney stone. Dkt. No. 46 at ¶22; Dkt. No. 49-2 at 3.

Based on these findings, Dr. Tannan concluded that the plaintiff had gastroesophageal reflux disease ("GERD"). Dkt. No. 46 at ¶23; Dkt. No. 49-2 at 3. Dr. Tannan explains that GERD occurs when stomach acid repeatedly flows back into the esophagus. Dkt. No. 46 at ¶23. He ordered the antacids Ranitidine and Omeprazole, which help block acid production, and he recommended a follow-up and annual labs. Id. at ¶¶24–26; Dkt. No. 49-2 at 3. The plaintiff's progress notes include the order for Ranitidine for one year beginning on March 3, 2017. Dkt. No. 49-2 at 4, 54. Dr. Tannan avers that he did not believe the plaintiff was suffering from a serious or life-threatening condition. Dkt. No. 46 at ¶27. He says that, according to the plaintiff's medical records, he did not again see the plaintiff in 2017. Id. at ¶29. He says that between March 3, 2017 and March 2, 2018, the plaintiff did not make him aware that the Ranitidine was not helping his stomach pain, worsening his pain or causing pain in his back or side. Id. at ¶30.

The plaintiff says that in June and December 2017 he put in HSRs addressed to Dr. Tannan about his Ranitidine. Dkt. No. 51 at ¶61. He does not say where in the record these HSRs appear, but the court located them in the defendants' evidence. Dkt. No. 49-3 at 1–2. Hansen responded to both HSRs by scheduling the plaintiff for a nursing sick call appointment the same day she received the HSR. Id. There is no evidence suggesting the plaintiff again saw Dr. Tannan in 2018 or that Dr. Tannan was aware in 2017 of the plaintiff's concerns about his Ranitidine.

### e. Spring 2018 Appointments

Dr. Tannan saw the plaintiff three times in the Spring of 2018. He first saw the plaintiff on March 2, 2018[1] for a follow-up regarding his abdominal pain. Dkt. No. 45 at ¶62; Dkt. No. 49-2 at 7. The plaintiff told Dr. Tannan that he felt "a lump in the epigastric area lying down on his left side." Dkt. No. 49-2 at 7. The plaintiff reported that his GERD symptoms of "heartburn and acid taste in the mouth have considerably improved with the medications." Id. The plaintiff reported no weight loss and said he was able to exercise and jog. Id. The plaintiff asserts that he told Dr. Tannan about pain in his left side and stomach and that his medication was *not* working. Dkt. No. 51 at ¶¶62–63. He refers to the HSRs he sent in 2017 in which he said that his medication was not working. Id.; Dkt. No. 49-3 at 1–2. Again, he does not cite any evidence in support of his statement that Dr. Tannan was aware of those HSRs or his concerns.

---

[1] Although the proposed finding of fact reflects a date of March 2, 2018, dkt. no. 45 at ¶62, the notes themselves reflect a date of March 26, 2018, dkt. no. 49-2 at 7.

Dr. Tannan took the plaintiff's vitals, which were normal. Dkt. No. 45 at ¶65; Dkt. No. 49-2 at 7. He noted that the plaintiff was not in distress, his lungs were clear, his abdomen was not distended and he showed no signs of epigastric hernia, such as a "palpable mass" on his left side. Dkt. No. 49-2 at 7. Dr. Tannan again concluded that the plaintiff had GERD, and he recommended that the plaintiff undergo routine labs. Id.; Dkt. No. 46 at ¶36. Dr. Tannan explains that the labs would show the plaintiff's hemoglobin level and could rule out a stomach ulcer, which could cause stomach bleeding or anemia. Dkt. No. 46 at ¶36. Again, he did not believe that the plaintiff had a serious or life-threatening condition because the plaintiff's labs and tests all returned normal results. Id. at ¶38. He says the plaintiff did not tell him during this visit that his medication was not helping his stomach pain, that it was worsening his pain or that it was causing pain to his back or side. Id. at ¶37. In late March 2018, Tannan renewed the plaintiff's prescription of Ranitidine for a year to treat the plaintiff's GERD symptoms. Dkt. No. 45 at ¶68; Dkt. No. 49-2 at 8, 51.

The plaintiff reiterates that he told Dr. Tannan during his appointment and before his medication renewal that his medication was not working, but he cites no evidence in support of that statement. Dkt. No. 51 at ¶¶67–68. He insists that he told Dr. Tannan that he had other symptoms, including weakness, dizziness, black-tarry stool, sudden pain in his stomach and pain in his back, neck, and shoulder. Id. at ¶66. He cites "record: 000613," but the court was not able to find in the record a document with this page number. Id.

On April 11, 2018, Dr. Tannan saw the plaintiff for another follow-up exam. Dkt. No. 45 at ¶69. Dr. Tannan noted that the plaintiff's "extensive workup labs

are all within normal limits," and that the previous CT scan and ultrasound of his abdomen were negative. Dkt. No. 49-2 at 9. Dr. Tannan's notes show that the plaintiff complained that he was "passing hard stool dark green color," but he remained able to play basketball and exercise. Id. The plaintiff contends that he experienced pain when he exercised, but he cites no record evidence in support of that statement. Dkt. No. 51 at ¶72.

Dr. Tannan noted that the plaintiff was on Ranitidine and Omeprazole. Dkt. No. 49-2 at 9. He took the plaintiff's vitals, which were normal, and recorded his weight, which was 265 pounds. Id. The plaintiff had no localized pain in his abdomen or tenderness in the "right upper quadrant," which allowed Dr. Tannan to rule out gallbladder inflammation. Id.; Dkt. No. 46 at ¶¶46–47. Dr. Tannan concluded that the plaintiff still suffered from GERD and was morbidly obese with a Body Mass Index (BMI) of 37, well outside the "normal" range of 18 to 25. Dkt. No. 49-2 at 9; Dkt. No. 46 at ¶¶48–50. The plaintiff's BMI led Tannan to believe that the plaintiff was able to meet his caloric needs despite his stomach pain. Dkt. No. 46 at ¶51. Dr. Tannan recommended that the plaintiff try an "aggressive," 1,800 calorie diet to lose weight, continue with Omeprazole and begin taking a stool softener. Dkt. No. 49-2 at 9. He scheduled the plaintiff for another Fecal Occult Blood Test to rule out colon cancer, a stomach ulcer or blood in his stool. Dkt. No. 46 at ¶¶52–54. Dr. Tannan remained convinced that the plaintiff's condition was not life-threatening or serious because his labs and vitals remained normal, he had no limitation in function, he had no localized pain and the pain in his abdomen did not interfere with his activity or caloric intake. Id. at ¶56.

On May 30, 2018, the plaintiff had his third follow-up appointment with Dr. Tannan. Dkt. No. 45 at ¶80. Dr. Tannan noted that, according to the plaintiff, his symptoms lasted "only for one half to one hour [and] [did] respond to antacids." Dkt. No. 49-2 at 9. He noted that the plaintiff's fecal blood test was negative. Id. The plaintiff's vitals were normal, and his weight was down to 261 pounds. Id.; Dkt. No. 46 at ¶58. Dr. Tannan observed that the plaintiff's abdomen still was nondistended, but that he had mild tenderness and pain above his stomach. Dkt. No. 49-2 at 9; Dkt. No. 46 at ¶58. Tannan diagnosed the plaintiff with Gastritis, which is inflammation in the stomach, and morbid obesity. Dkt. No. 49-2 at 9; Dkt. No. 46 at ¶¶59–60. He ordered the plaintiff to remain on the same medications because he "believed they could treat the Gastritis." Dkt. No. 46 at ¶61.

### f.    December 2018 – H. pylori Infection

On December 4, 2018, the plaintiff tested positive for Helicobacter pylori infection, also known as H. pylori. Dkt. No. 45 at ¶85; Dkt. No. 49-2 at 10. Dr. Tannan explains that H. pylori is caused by bacteria that is passed from person to person through saliva, vomit or stool or through contaminated food or water. Dkt. No. 46 at ¶65. H. pylori presents as stomach pain, bloating and loss of appetite. Id. at ¶66. It is detected using a stool antigen test, which looks for antibodies to H. pylori. Id. at ¶67. This test can detect only whether the patient has antibodies and cannot detect when the patient contracted H. pylori. Id. at ¶¶67–68. Medical staff gave the plaintiff a fourteen-day course of a proton-pump inhibitor (which is another name for antacids like Ranitidine and Omeprazole), as well as the antibiotics Clarithromycin and Amoxicillin. Id. at ¶¶69–71.

g.    Winter and Spring 2019

On January 15, 2019, Dr. Tannan renewed the plaintiff's prescription for Ranitidine with a start date of February 11, 2019 and an end date of March 19, 2019. Dkt. No. 49-2 at 16. He again renewed that prescription on March 15, 2019, with a start date of March 20, 2019 and an end date of September 16, 2019. Id. at 17, 56. Dr. Tannan renewed the prescription on September 3, 2019, beginning September 17, 2019 and ending on April 7, 2020. Id. at 56.

On March 7, 2019, Dr. Tannan saw the plaintiff for continued complaints of abdominal pain despite his H. pylori treatment. Dkt. No. 45 at ¶88. Dr. Tannan noted that the plaintiff still had mild epigastric discomfort but no tenderness in his right upper quadrant. Dkt. No. 49-2 at 19–20. Dr. Tannan ordered a stool softener and a consultation with gastroenterology because the plaintiff remained in pain despite his treatment for H. pylori. Id. The plaintiff also told Dr. Tannan that he was experiencing pain despite taking the antacids, but Dr. Tannan avers that the plaintiff did not tell him the Ranitidine was worsening his stomach pain or causing him pain in his back or side. Dkt. No. 46 at ¶74. Dr. Tannan reiterates that he still did not believe the plaintiff's condition was serious or life-threatening because he did not have symptoms or "significant lab abnormalities that would be more pressing." Id. at ¶91.[2]

The plaintiff again insists that he told Dr. Tannan "multiple times" that the Ranitidine was not working and "made him nauseous, dizzy and weak after he

_____

[2] Dr. Tannan's progress notes from the March 7, 2019 examination also include an assessment of "PUD - Peptic ulcer disease." Dkt. No. 49-2 at 20. It is not clear whether this means the plaintiff had an active ulcer.

would eat." Dkt. No. 51 at ¶90. He cites an HSR he submitted on November 23, 2018, complaining that he was "having black bowel movements" and was "still having the same stomach and anal wall pain." Id. at ¶91; Dkt. No. 51-1 at 50. A nurse responded to the plaintiff's HSR two days later and scheduled him for a nursing sick call appointment the same day. Id. at 50. At that appointment, a non-defendant nurse reviewed the plaintiff's HSR with him and informed him of an upcoming appointment with a provider. Dkt. No. 51-1 at 23. The plaintiff denied seeing blood in his stool, on his underwear or on toilet paper. Id. He claimed to still have "anal wall pain" but denied having hemorrhoids. Id. The plaintiff also cites one page of an incomplete, undated correspondence in his medical records that notes "[b]lack, tarry, or bloody stools . . . means the ulcer is bleeding." Dkt. No. 51-1 at 52. It is not clear who sent this correspondence to the plaintiff, to what it was responding or whether the plaintiff had an active ulcer in March 2019.

On March 28, 2019, gastroenterologist Dr. Mary McDonald (who is not a defendant) examined the plaintiff and recommended he undergo an upper endoscopy or an EGD. Dkt. No. 45 at ¶92; Dkt. No. 49-2 at 12–13. Dr. Tannan explains that an EGD is a procedure that examines the inside of the esophagus, stomach and duodenum. Dkt. No. 46 at ¶76. Dr. McDonald performed the EGD on April 25, 2019, which revealed "a very small hiatal hernia" less than a centimeter in size. Dkt. No. 49-2 at 23. The results of the exam were "otherwise normal." Id. Dr. Tannan explains that a hiatal hernia is a defect in the diaphragm where part of the stomach goes up into the chest. Dkt. No. ¶46 at ¶78. It can predispose someone for reflux or contribute to and increase reflux. Id. He clarifies

that a hiatal hernia is not an ulcer. Id. at ¶79. Dr. Tannan asserts that ulcers can be caused "by multiple factors such as spicy foods, stress, taking Ibuprofen or steroids." Id. at ¶80. He says that ulcers are treated with antacids like Ranitidine, Omeprazole and Docusate Senna and Sucralfate—most of which he had at some point prescribed for the plaintiff. Id. at ¶81.

The plaintiff contends that the EGD also found "two irregular and tan fragments of soft tissue that measure 0.3 and 0.5 cm." Dkt. No. 51 at ¶93. He asserts this tissue "was the two ulcers [that he] was treated for as well." Id. He cites a "Surgical Pathology Report" from Dr. McDonald dated April 25, 2019. Dkt. No. 51-1 at 48. This report shows that a specimen was submitted that contained the "two irregular and tan fragments of soft tissue." Id. The report also notes that "[a]ctive inflammation or Helicobacter-like organisms are not identified." Id. The report does not include a diagnosis of an ulcer and does not say that the tissue samples indicated that the plaintiff had an ulcer in April 2019. The plaintiff does not cite any evidence that confirms his statement that he had an ulcer at that time. But in a progress note from an April 30, 2020 examination with Dr. Tannan, the doctor notes that the plaintiff has a "history of gastric ulcer" and that he "underwent EGD in April 2019 which showed a small ulcer." Dkt. No. 49-2 at 33. The notes also list "Peptic ulcer disease" in the plaintiff's list of symptoms. Id.; see also Dkt. No. 51-1 at 2 (list of the plaintiff's diagnoses showing peptic ulcer disease as of April 30, 2020).

The plaintiff asserts that one of the most common causes of an ulcer is an H. pylori bacterial infection, with which he was diagnosed in December 2018. Dkt. No. 51 at ¶95. In support, he cites a page of "Patient Education Instructions"

dated September 8, 2020, which explains peptic ulcers and their causes. Id.; Dkt. No. 51-1 at 54. This document lists an H. pylori infection and long-term use of nonsteroidal anti-inflammatory drugs as the "most common causes of ulcers." Id.

On May 1, 2019, Dr. McDonald recommended that the plaintiff's Omeprazole be discontinued but that his Ranitidine be continued. Dkt. No. 49-2 at 24. Dr. Tannan reviewed Dr. McDonald's EGD report, which he says confirmed his belief that the plaintiff did not have a serious medical issue. Dkt. No. 46 at ¶83. He says the EGD was normal aside from the small hiatal hernia and did not reveal inflammation or erosion in the plaintiff's stomach or signs of an ongoing H. pylori infection. Id. Tannan says the EGD ruled out an ulcer, H. pylori infection or other serious condition. Id. The plaintiff disagrees with Dr. Tannan's conclusion. Dkt. No. 51 at ¶97. He cites only Dr. McDonald's "Surgical Pathology Report" without explaining how that report contradicts Dr. Tannan's assessment. Id.; Dkt. No. 51-1 at 48.

On May 3, 2019, the plaintiff refused his Ranitidine and Omeprazole. Dkt. No. 49-2 at 55. On May 19, 2019, he refused his stool softener. Id. On May 21, 2019, Dr. Tannan entered an order for calcium carbonate for the plaintiff for one year. Id. at 56. He explains that calcium carbonate is an antacid that acts to neutralize stomach acidity. Dkt. No. 46 at ¶87.

h.    August 2019 through April 2020

Dr. Tannan avers that between August 17, 2019 and March 3, 2020, the plaintiff did not report to him that he was experiencing pain in his chest, stomach, side or back or that he needed pain medication. Dkt. No. 46 at ¶¶89–90. He says he did not examine the plaintiff during that time. Id. at ¶91.

The plaintiff insists that he sent an HSR on June 20, 2019. Dkt. No. 51 at ¶103. The HSR he cites is not in his exhibits but is included in the defendants' exhibits. Dkt. No. 49-3 at 9. The HSR is addressed to "doctor Tannan" and complains that the plaintiff is "still in pain" and that he has "been waiting on him patiently but now [he is] in too much pain." Id. A non-defendant nurse responded the next day by scheduling the plaintiff for a nursing sick call appointment. Id. There is nothing on the HSR to indicate that Dr. Tannan was made aware of the plaintiff's concerns. The plaintiff saw a non-defendant nurse for the sick call appointment the same day. Dkt. No. 51-1 at 28. The nurse discussed the results of the EGD, and the plaintiff continued to complain of the same recurrent pain. Id. The nurse explained that she had spoken "with Dr. Tannan earlier and the medication changes recommended are being reviewed." Id. She said she would recommend to Dr. Tannan "to check a series of capillary blood glucose levels prior to meals" and would schedule a follow-up appointment. Id. The plaintiff says that this nurse made Dr. Tannan aware that he needed pain medication. Dkt. No. 51 at ¶104. He also says that Dr. Tannan rejected Dr. McDonald's recommendation that the plaintiff stop taking Omeprazole. Id. (citing Dkt. No. 51-1 at 22).

For about three weeks in March 2020, while he was housed in the Restricted Housing Unit, the plaintiff refused medications. Dkt. No. 49-2 at 38. The plaintiff says he stopped taking his medication because he was waiting for Dr. Tannan to change his prescriptions "like he always say [sic] he's going to do." Dkt. No. 51 at ¶113. He says he resumed his medications "after he seen [sic] no new meds were coming." Id. The plaintiff says he never refused medical help and was only "waiting on his Doctor to give him something different like he promised."

Id. The plaintiff's Medication Administration Record shows that he refused his medications as early as March 5, 2020, resumed taking Ranitidine and calcium carbonate by March 26, 2020 and resumed taking the stool softener by March 20, 2020. Dkt. No. 49-2 at 38; Dkt. No. 51-1 at 61–62.

In April 2020, the Federal Drug Administration recalled Ranitidine. Dkt. No. 45 at ¶114; Dkt. No. 49-2 at 31. Dr. Tannan discontinued all orders of Ranitidine pending the recall. Dkt. No. 46 at ¶99. He ordered Omeprazole for the plaintiff to address his continued symptoms, despite Dr. McDonald's recommendation that the plaintiff discontinue Omeprazole. Id. at ¶100; Dkt. No. 49-2 at 31. Dr. Tannan says he also ordered Sucralfate for the plaintiff, which coats the stomach to protect the stomach lining. Dkt. No. 46 at ¶101.

Dr. Tannan avers that prior to the FDA's recall, he did not discontinue the plaintiff's Ranitidine at any time and instead consistently renewed it. Id. at ¶105. The plaintiff contests that statement and cites two pages of his medication orders that both show his Ranitidine prescription as "discontinued" as of March 19, 2019. Dkt. No. 51-1 at 5, 14. But the plaintiff does not dispute that Dr. Tannan renewed his Ranitidine on March 15, 2019 to begin March 20, 2019 and end on September 16, 2019. Dkt. No. 45 at ¶119; Dkt. No. 51 at ¶119; see Dkt. No. 49-2 at 17. On September 3, 2019, Dr. Tannan again refilled the plaintiff's prescriptions for Ranitidine and his stool softener and extended the prescriptions to April 7, 2020. Dkt. No. 49-2 at 56. Dr. Tannan explains that when a provider places a renewal order, the renewal order discontinues the previous order, which is why a patient's medication orders might show as "discontinued" on the medication order page in his records. Dkt. No. 46 at ¶104. The plaintiff contests

22

Dr. Tannan's explanation, but in support cites only to other providers' prescriptions of medications other than Ranitidine.[3] Dkt. No. 51 at ¶121; Dkt. No. 151 at 7, 10.

i. The Plaintiff's HSRs

Dr. Tannan avers that as a physician, he does not triage HSRs. Dkt. No. 46 at ¶107. A triaging nurse reviews HSRs and determines whether to schedule the incarcerated person for a nursing sick-call appointment or an appointment with an Advanced Care Provider. Id. at ¶108. If the nurse schedules an appointment with a provider, she checks the "ACP" box next to the "Scheduled to be seen" box on the HSR. Id. at ¶110. The provider sees the incarcerated person according to his or her schedule. Id. A triaging nurse also can refer an HSR to an Advanced Care Provider. Id. at ¶111. If she does, the nurse will mark the "ACP" box next to the box titled "Refer HSR to" on the HSR form. Id. Dr. Tannan avers that if the HSR does not have a marked "ACP" box, a provider did not see or receive the HSR. Id. He says he sees an HSR only if a nurse refers it to him. Id. at ¶112.

Dr. Tannan avers that the plaintiff submitted twelve HSRs between 2017 and April 2020. Id. at ¶113. He says that the triaging nurse referred only two of those requests to a provider and checked the "ACP" box on both of those forms. Id. at ¶114; Dkt. No. 49-3 at 11–12. He says the plaintiff filed those HSRs in April

---

[3] The defendants discuss pain medications, including narcotic drugs and NSAIDs (nonsteroidal anti-inflammatory drugs), at length. Dkt. No. 45 at ¶¶106–111. Dr. Tannan avers that a patient with stomach pain should not take NSAIDs because they can cause ulcers. Dkt. No. 46 at ¶93. The plaintiff does not dispute these proposed facts except to note that he was never offered or prescribed narcotics. Dkt. No. 51 at ¶¶106–111. Neither party points to evidence showing that the plaintiff was prescribed NSAIDs or narcotic drugs for pain between February 2017 and April 2020, the relevant time of the complaint.

23

2020 and that they concerned the recall of Ranitidine. Dkt. No. 46 at ¶114; Dkt. No. 49-3 at 11–12. The plaintiff insists that Dr. Tannan saw him after he filed an HSR that did not come back with the "ACP" box checked. Dkt. No. 51 at ¶129. He cites what he says is one such example, an HSR he filed on April 9, 2018 for which he says Dr. Tannan saw him on April 11, 2018. Id.; Dkt. No. 51-1 at 3; Dkt. No. 49-2 at 9. The "RN/LPN" box next to "Scheduled to be seen in HSU" box is checked on the plaintiff's HSR; the "ACP" box is not checked. Dkt. No. 51-1 at 3.

j.     The Plaintiff's Declaration

The plaintiff provided a declaration about his medical treatment at Oshkosh. Dkt. No. 56. He asserts that at an unspecified time in 2015, while he was in segregation, he contacted a sergeant on his intercom because he "was in excruciating pain." Id. at ¶2. The sergeant told the plaintiff to fill out an HSR and he "would be seen by the morning." Id. The plaintiff says Nurse Hansen placed the plaintiff on the provider's list to be seen, but that he was left "in pain for several days" in the meantime. Id. at ¶3. The plaintiff does not say when this occurred.

The plaintiff says he was placed on Dr. Tannan's patient list, and Dr. Tannan eventually prescribed him Ranitidine for acid reflux. Id. at ¶4. He says Dr. Tannan told him that his "body had to adjust to the new meds when [he] told [Dr. Tannan] that the meds working [sic] and [he] was still in pain." Id. at ¶5. He avers that Dr. Tannan "would take [him] on and off the meds when [he] would complain about the meds not working." Id. The plaintiff says he "never asked for a narcotic just anything but the meds that was not working." Id. at ¶7. He says he

told nurses about his medications not working for three years, "and they told Dr. Tannan." Id. at ¶9. He says he also told Dr. Tannan "multiple time's that the meds was not working face to face and through HSU-3035 forms." Id. at ¶11. He says that Dr. Tannan nonetheless "never gave any medication that did help with the pain." Id. at ¶10. Again, the plaintiff does not specify dates or visits when these events occurred and does not provide any additional information or evidence.

        3.    *The Plaintiff's Grievance*

Incarcerated persons may file grievances about the living conditions at their institution through the Inmate Complaint Review System. Dkt. No. 45 at ¶131. Defendant O'Donnell has access to the Inmate Complaint Tracking System, a database that stores all documents and reports submitted and generated related to incarcerated persons' grievances. Id.

On April 22, 2020, the plaintiff filed a grievance related to Dr. Tannan's treatment of his pain and stomach issues from February 2017 through March 2020. Dkt. No. 48-1 at 12. He alleged that Dr. Tannan prescribed him Ranitidine on February 19, 2017, discontinued it on August 17, 2019 and "didn't prescribe [him] nothing for [his] stomach pain until 3-3-20," while he was in segregation. Id. He says that on April 7, 2020, he received a memorandum about the FDA recalling Ranitidine, and he filed an HSR about that on April 12, 2020. Id. He asked "to have Dr. Tannan removed as [his] provider because not only did he put [the plaintiff] in harms way with this medication he let [him] suffer as well." Id.

An institutional complaint examiner received the grievance the next day and reviewed it on April 30, 2020. Id. at 1. The complaint examiner contacted the

Assistant Manager of the HSU to review the complaint and the plaintiff's medical records. Id. at 2. The records showed that the plaintiff had turned in his Ranitidine on April 8, 2020 and stated, "'I can't take it because it hurts my stomach' and 'I need to be put on something else.'" Id. The plaintiff was scheduled to see Dr. Tannan on April 30, 2020. Id. The complaint examiner concluded that the plaintiff was complaining about "the care received to date" from Dr. Tannan. Id. at 2–3. The complaint examiner explained that, although the plaintiff "may not agree with" Dr. Tannan's decision, it was "based on continuous years of education and experience." Id. at 3. The complaint examiner determined that the plaintiff was receiving adequate care and that his "concerns [were] being addressed." Id. The complaint examiner determined that the plaintiff's grievance did not establish deliberate indifference and recommended dismissing the complaint. Id. On May 14, 2020, the reviewing authority reviewed the complaint examiner's decision, agreed with the conclusions and accepted the recommendation to dismiss the plaintiff's grievance. Id. at 4.

On May 25, 2020, the plaintiff appealed the dismissal of his complaint. Id. at 17. The plaintiff complained about the complaint examiner's "copy [and] paste format" of the dismissal and accused the complaint examiner of ignoring institutional policies. Id. He asserted that the complaint examiner had failed to investigate his complaint and said that if he received additional "copy [and] paste responses for serious health concerns, [he] would not hesitate to bring forth a 42 USC 1983." Id. A corrections complaint examiner received the plaintiff's appeal on May 28, 2020. Id. at 6. He agreed with the complaint examiner that the plaintiff had received ongoing "[c]are for the issue." Id. He found it "apparent [that] this

complaint [did] not establish any deliberate indifference to a serious medical need but, rather, a mere difference of opinion between the complainant and prison medical staff regarding appropriate treatment." Id. The corrections complaint examiner opined that prison medical staff had exercised medical judgment with which the plaintiff simply disagreed. Id. He recounted that the Regional Nursing Coordinator had reviewed the plaintiff's medical concerns, and that there was "no reason to believe the care offered to date is not adequate to the demonstrated need." Id. The corrections complaint examiner recommended dismissing the plaintiff's appeal. Id.

Defendant O'Donnell avers that on June 1, 2020, she reviewed the corrections complaint examiner's recommendation, reviewed the plaintiff's appeal and grievance and agreed with the recommendation to dismiss the appeal. Dkt. No. 48 at ¶¶17–18; Dkt. No. 48-1 at 7. O'Donnell accepted the corrections complaint examiner's recommendation as the decision of the Secretary and dismissed the plaintiff's appeal. Dkt. No. 48 at ¶18; Dkt. No. 48-1 at 7. She explains that when she makes these final decisions, she relies on the grievance, the appeal, the investigations of the complaint examiner and corrections complaint examiner, the expert opinion of prison staff and any additional evidence in the plaintiff's medical records. Dkt. No. 48 at ¶19. When a complaint relates to medical care, the experts include providers, the HSU Manager, the Health Services Nursing Coordinator and the Regional Nursing Coordinator. Id. at ¶20.

O'Donnell says she reviewed all evidence in the plaintiff's complaint file, including sections of his medical record, before dismissing his appeal. Id. at ¶21

(citing Dkt. No. 48-1). She avers that she dismissed the appeal because her review of the investigation revealed that prison staff were addressing the plaintiff's concerns, and she did not believe that his complaint or appeal supported a finding of deliberate indifference by Dr. Tannan. Id. at ¶22. Without citing any record evidence, the plaintiff asserts that O'Donnell should have ordered the corrections complaint examiner to conduct an additional investigation, which he says "would of showed what [he] was saying was true." Dkt. No. 51 at ¶147.

Because the Office of the Secretary is the highest level of review for an institutional complaint, O'Donnell's decision on the plaintiff's appeal concluded the review process for his grievance. Dt. No. 45 at ¶148. O'Donnell says that as the Secretary's designee, her role is limited to reviewing and deciding institutional complaint appeals. Dkt. No. 48 at ¶26. Again without citing any record evidence, the plaintiff claims that O'Donnell "at this stage has all the power" and that "she could of ordered the ICE and CCE to investigate and see if Dr. Tannan abuse [the plaintiff]." Dkt. No. 51 at ¶150.

## II.    Discussion

### A.    Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, the non-moving party (here, the plaintiff) must provide more than assertions, allegations or denials; the plaintiff instead "needs to come forward with *evidence*" demonstrating his entitlement to relief and showing how each defendant was personally involved in the alleged conduct that would be sufficient to "support a jury's verdict in [his] favor" against each defendant. Beatty v. Olin Corp., 693 F.3d 750, 754 (7th Cir. 2012); see Cooper v. Haw, 803 F. App'x 942, 946 (7th Cir. 2020) (explaining that "argument alone is insufficient to avoid summary judgment").

B.     Eighth Amendment

As the court explained in the screening order, the court analyzes the plaintiff's claims under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim, the plaintiff must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016)

(*en banc*) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see Estelle, 429 U.S. at 103.

To satisfy the objective component, the plaintiff must show that he had a medical condition "that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). The plaintiff also must show that the defendants were deliberately indifferent, which "describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to violate the Eighth Amendment. Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021) (citing Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[] in a course of treatment known to be ineffective." Greeno, 414 F.3d at 655. In short, the plaintiff must show the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." Id. at 654 (quoting Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)).

C.    Analysis

The plaintiff occasionally cites pages of the record that, as best the court can determine, do not exist. If they do exist, the court has not been able to locate them in the plaintiff's exhibits, which—again, as far as the court can discern—are not in any particular order or organized in any categories. As the Seventh Circuit

has instructed, "[i]t is neither the district court's nor [the Court of Appeals'] job to piece together an argument" for a party. Su v. Johnson, No. 22-2204, 2023 WL 3335733, at *6 (7th Cir. May 10, 2023); see also Estate of Moreland v. Dieter, 395 F.3d 747, 759 (7th Cir. 2005) (noting that a court need "not scour a record to locate evidence supporting a party's legal argument"). If the plaintiff had evidence to support his claims but failed to identify it or provide it to the court, the court cannot consider that evidence in determining whether to grant or deny the summary judgment motions.

        1.    *Hansen*

The undisputed evidence shows that defendant Hansen was minimally involved in the plaintiff's medical care. She occasionally reviewed his HSRs, including the one he filed on October 7, 2015. Hansen responded to that HSR, recounting that the plaintiff had been seen about two weeks earlier for the same complaints, and she reviewed the notes from that appointment. Her review led her to believe that the plaintiff was suffering from a chronic condition and not from a new or emergent condition that required immediate care. She responded to the plaintiff's request by noting his upcoming appointment with a doctor and telling him he could ask to see a nurse for any significant changes in his pain.

Hansen's declaration and response to the plaintiff's HSR shows that she did not disregard his complaints or ignore his request. She exercised her medical judgment and based her response on the plaintiff's medical chart, the nurse's notes from his earlier visit and the plaintiff's already scheduled upcoming doctor appointment. She then reminded the plaintiff that if his pain changed or worsened, he could request a nurse appointment. This thorough response does

not demonstrate to deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

It is possible that Hansen's treatment decision and response to the plaintiff's request were incorrect or mistaken. The plaintiff wrote that the pain in his abdomen, chest and back was "still killing" him, and he asked "to be checked out as soon as possible." Dkt. No. 49-1 at 3. Perhaps Hansen should have concluded that the plaintiff required an immediate appointment with a nurse. Even if that is true, a mistaken belief regarding medical treatment does not equate to deliberate indifference. See Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016); Williams v. Van Buren, No. 22-2918, 2023 WL 3451407, at *2 (7th Cir. May 15, 2023) ("Being wrong is not inconsistent with exercising professional judgment."). If Hansen's decisions were incorrect—and the court is not saying they were—that would show only that Hansen may have been negligent in reaching her treatment decision. See Grant v. Heidorn, 802 F. App'x 200, 205 (7th Cir. 2020) (citing Cesal v. Moats, 851 F.3d 714, 724 (7th Cir. 2017)) ("[F]ailing to correctly diagnose a condition is evidence of negligence, not deliberate difference."). But neither negligence nor gross negligence violates the Constitution. See Farmer, 511 U.S. at 835–36; Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001).

The plaintiff generally asserts that Hansen's course of action and decision not to schedule him for a nursing sick call appointment also violated prison

policies. He does not cite the specific pages of the record containing the policies he thinks Hansen violated. Even if he had, §1983 "protects against 'constitutional violations, not violations of . . . departmental regulation[s] and . . . practices.'" Estate of Simpson v. Gorbett, 863 F.3d 740, 746 (7th Cir. 2017) (quoting Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003)). Whether Hansen failed to follow a specific prison or institutional policy is not relevant to the question of whether she violated the plaintiff's constitutional rights (unless the policy violation independently constitutes a violation of the Constitution).

The undisputed evidence shows that Hansen exercised her medical judgment when she reviewed the plaintiff's request for treatment and determined the proper course of action based on the plaintiff's medical chart and her experience. Even if her decision was incorrect—and again, the court is not saying that it was—it was not deliberately indifferent to the plaintiff's condition. A reasonable jury could not conclude that Hansen disregarded the plaintiff's complaints and left him to suffer unnecessarily. The court will deny the plaintiff's motion for summary judgment against Hansen, will grant the defendants' motion for summary judgment for Hansen and will dismiss her as a defendant.

   2.  *Dr. Tannan*

    a.  Merits

The plaintiff also claims that Dr. Tannan discontinued his Ranitidine at various times and provided no medication to replace it. But the plaintiff's medical records show, and the plaintiff does not dispute, that Dr. Tannan consistently prescribed him Ranitidine from March 3, 2017 until the FDA discontinued it on April 7, 2020. Dkt. No. 49-2 at 16–17, 44–51, 54–56.

33

The plaintiff also claims that Dr. Tannan improperly managed his pain in 2017 and 2018 and failed to provide him adequate medical treatment. He often cites his HSRs in support of his contention that Dr. Tannan knew that his pain persisted and failed to respond appropriately to his complaints and symptoms. For example, the plaintiff cites HSRs he filed in June and December 2017 in support of his contention that he told Dr. Tannan that he had pain in his left side and stomach, that his medication was not working and that he was suffering from new symptoms including weakness, dizziness and pain. But there is no evidence that Dr. Tannan ever saw or was aware of those HSRs. The plaintiff also cites in support of his contention that he again discussed those concerns with Dr. Tannan during the March 2, 2018 appointment, citing to a page in his medical records that the court could not locate. Dkt. No. 51 at ¶66.

Even if the court could find and review the plaintiff's cited HSRs, those documents would not be admissible evidence if presented to a jury at trial. HSRs, like grievances filed by incarcerated persons, are "unsworn statements not subject to the penalties of perjury." Jones v. Bayler, Case No. 22-1296, 2023 WL 3646069, at *3 (7th Cir. May 25, 2023) (citing Vaughn v. King, 167 F.3d 347, 354 (7th Cir. 1999); Fed. R. Evid. 801(c), 802). Because the plaintiff's statements in his HSRs would not be admissible at trial, they cannot create a genuine dispute of material fact sufficient to defeat summary judgment. Id. ("[E]vidence cited at summary judgment must be admissible at trial.").

But there is other *admissible* evidence that might support a claim that Dr. Tannan continued to provide medication that did not address the plaintiff's symptoms—and perhaps even worsened them—despite the plaintiff's repeated

complaints. For example, although Dr. Tannan ruled out an ulcer during the plaintiff's appointments in 2016 through 2018, his progress notes from the March 7, 2019 examination include an assessment of "PUD - Peptic ulcer disease." Dkt. No. 49-2 at 20. There also is some evidence that an ulcer was detected during the EGD the plaintiff underwent in April 2019. The reports from that procedure note only a small hiatal hernia with no other abnormalities. Dr. Tannan avers that a hiatal hernia is not an ulcer and that the EGD otherwise ruled out an ulcer. Dkt. No. 46 at ¶¶79, 83. But the plaintiff insists that a tissue sample taken during the EGD showed "two irregular and tan fragments of soft tissue" that signaled an ulcer. Dkt. No. 51 at ¶93. Dr. Tannan then recorded in an April 30, 2020 progress note that the plaintiff has a "history of gastric ulcer" and that the EGD revealed "a small *ulcer*," yet he said nothing about a small hernia. Dkt. No. 49-2 at 33 (emphasis added). The plaintiff's medical notes also include peptic ulcer disease in a list of his diagnoses as of April 30, 2020—the same day as his appointment with Dr. Tannan. Dkt. No. 51-1 at 2. Dr. Tannan again notes in a June 3, 2020, progress note that the plaintiff has peptic ulcer disease. Dkt. No. 49-2 at 33.

Taken together, this evidence suggests that the plaintiff may have had an ulcer as early as April 2019, that the ulcer was missed or misdiagnosed after the EGD and that Dr. Tannan either missed it or disregarded it and gave the plaintiff ineffective treatment for conditions he may not have had while *not* treating the plaintiff for an ulcer that he may have had. It is possible that misdiagnosis and improper treatment led to the plaintiff's continued pain from April 2019 through at least April 2020, when it was diagnosed and treated. The question is whether that evidence would allow a jury to determine that Dr. Tannan was *deliberately*

35

indifferent to the plaintiff's condition or that he only *missed* the ulcer right away and provided ineffective treatment, though it was well-intentioned and consistent.

Like Nurse Hansen, Dr. Tannan cannot be held constitutionally liable if he merely made a mistake when providing the plaintiff medical treatment. See Whiting, 839 F.3d at 662 ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference."); Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation."). If Dr. Tannan mistakenly diagnosed the plaintiff's condition but continued to provide him treatment—even ineffective treatment— that would be "evidence of negligence, not deliberate difference." Grant, 802 F. App'x at 205). The plaintiff must have evidence that Dr. Tannan *was aware* of the plaintiff's ulcer but *intentionally* disregarded or mistreated it. See Farmer, 511 U.S. at 837; Perez, 792 F.3d at 776.

Dr. Tannan avers that the plaintiff never told him that the medications he prescribed were not working, were worsening the plaintiff's pain or were causing him additional pain in his stomach, chest, back or side. He says he had no reason to believe the plaintiff was suffering from an ulcer or another serious condition. In his declaration, the plaintiff avers that he repeatedly told Dr. Tannan, both in person and through HSRs, that the medications Tannan had prescribed were not working and that he asked for different medication to help with his pain. Dr. Tannan says he did not review any HSR that the plaintiff submitted. But even if that is true, there is evidence through the plaintiff's declaration that he told Dr. Tannan "face to face" on multiple occasions that he

36

needed different medication because the Ranitidine and others were not working for his pain. Dkt. No. 56 at ¶11. The plaintiff's declaration is vague and does not give dates or details about these interactions. But the declaration is sworn to be true under penalty of perjury. Id. at 1. That means there is evidence both that the plaintiff *did not* tell Dr. Tannan that his medication was not working or that it was worsening his pain and evidence that he *did* tell Dr. Tannan about his concerns with his medication and that Dr. Tannan took either no action or inadequate action to address those concerns.

A prison official who "doggedly persist[s] in a course of treatment known to be ineffective" may be held liable for being deliberately indifferent to an incarcerated person's condition in violation of the Eighth Amendment. Greeno, 414 F.3d at 655. A reasonable jury could believe Dr. Tannan's version of the events and find that the plaintiff never made him aware that his medications were not working or were worsening his pain. But a reasonable jury also could believe the plaintiff's version of the events and conclude that Dr. Tannan *was* aware that the plaintiff's pain was continuing or worsening, that the prescribed medications were not helping and that Dr. Tannan should have prescribed something else but did not and merely told the plaintiff that his body needed time to adjust to the medications.

It is not the court's role to decide which of these competing versions of the facts is more credible or accurate; that is a job for the jury. See Payne v. Pauley, 337 F.3d 767, 771 (7th Cir. 2003) (citing In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 655 (7th Cir. 2002)). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248). Although the evidence is slim, a reasonable jury could reject Dr. Tannan's version of the events, believe the plaintiff's version of events and conclude that Dr. Tannan was knowingly and deliberately indifferent to the plaintiff's need for different treatment for his chronic pain. That means that Dr. Tannan is not entitled to judgment as a matter of law, and the court will deny his motion for summary judgment. See Petties, 836 F.3d at 726 (holding that "even if a doctor denies knowing that he was exposing a plaintiff to a substantial risk of serious harm, evidence from which a reasonable jury could infer a doctor knew he was providing deficient treatment is sufficient to survive summary judgment"). Because the court concludes that there are disputes of material fact, the court also will deny the plaintiff's motion for summary judgment against Dr. Tannan.

> b.    Qualified Immunity

Dr. Tannan asserts that even if the court does not grant him summary judgment on the facts, he is entitled to qualified immunity. Dkt. No. 44 at 19. He says the plaintiff's claim against him asks "whether a DOC physician is deliberately indifferent for prescribing a medication that an inmate claims causes pain, or for discontinuing a medication without replacing it." Id. at 21. Dr. Tannan contends that existing precedent "puts it beyond debate that a disagreement with a professional's chosen course of treatment does not mean that the treatment reflects deliberate indifference." Id. at 21–22.

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Figgs v.

Dawson, 829 F.3d 895, 905 (7th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)). Qualified immunity is an affirmative defense. To defeat Dr. Tannan's assertion of qualified immunity, the plaintiff must show that 1) Dr. Tannan violated his constitutional right and 2) the right at issue was clearly established at the time of the violation. Pearson, 555 U.S. at 232. If the plaintiff fails to satisfy either inquiry, the defendant is entitled to qualified immunity. See Muhammad v. Pearson, 900 F.3d 898, 904 (7th Cir. 2018) (citing Gibbs v. Lomas, 755 F.3d 529, 537 (7th Cir. 2014)).

It was clearly established as early as 1984 that "prison officials must ensure that inmates receive adequate . . . medical care." Farmer, 511 U.S. at 832 (citing Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)). Ten years later, Farmer clarified that a prison official may not act or fail to act "despite his knowledge of a substantial risk of serious harm" to a prisoner. Id. at 842. Cases since have clearly established that a prison medical official violates the Eighth Amendment if he knowingly disregards an incarcerated person's complaints about an objectively serious medical condition. See, e.g., Petties, 836 F.3d at 728; Perez, 792 F.3d at 777; Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011).

The defendants assert that the evidence shows only that the plaintiff disagreed with Dr. Tannan's course of treatment, which is not deliberate indifference. Dkt. No. 44 at 21–22 (citing Snipes, 95 F.3d at 592). But for purposes of qualified immunity, the court must view the evidence in the light most favorable to *the plaintiff* because he is the nonmoving party. See Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019). The plaintiff's declaration suggests that Dr. Tannan not only disagreed with the plaintiff's preferred treatment but

39

also that he also knew that the treatment he provided the plaintiff was not working or was worsening his pain, yet he continued to prescribe the same medications and follow the same course of treatment. Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that Dr. Tannan disregarded the plaintiff's concerns and symptoms by persisting in an ineffective course of treatment. Dr. Tannan is not entitled to qualified immunity.

3.    *O'Donnell*

The court allowed the plaintiff to proceed on a claim that O'Donnell "disregarded his complaint and dismissed it without reviewing his allegations." Dkt. No. 10 at 15. The court observed at the screening stage that the plaintiff "does not explain how he knows whether O'Donnell reviewed his complaint and dismissed it sight unseen." Id. But because the court was required to accept the allegations of a complaint as true for purposes of screening, the court allowed the plaintiff to proceed on this claim against O'Donnell. Id.

The plaintiff does not have an inherent right to an unfettered institutional grievance process. Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir. 1996). The right he does have is limited, procedural in nature and derived from state law— not from the Constitution. Id.; see Owens v. Hinsley, 635 F.3d 950, 953 (7th Cir. 2011). But as the court explained in the screening order, the plaintiff could have had a possible claim against O'Donnell "for 'refusing to do her job and . . . leaving the [plaintiff] to face risks that could be averted by faithful implementation of the grievance machinery.'" Dkt. No. 10 at 15 (quoting Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009)).

O'Donnell avers that she reviewed the plaintiff's complaint, his appeal and the decisions and investigations of the institutional complaint examiner and corrections complaint examiners before deciding to dismiss his appeal. The plaintiff has provided no evidence that O'Donnell refused to do her job, ignored his appeal or dismissed his appeal without reviewing his allegations. He did not file or cite anything to counter O'Donnell's declaration. His claim amounts to dissatisfaction with O'Donnell's decision to dismiss his appeal and speculation about what she did or could have done differently. The plaintiff's speculative and conclusory statements on matters about which he lacks personal knowledge, without supporting evidence in the record, do not create a genuine dispute of fact that may defeat summary judgment. See Payne, 337 F.3d at 772 (citing Fed. R. Civ. P. 56(e) (now Rule 56(c)(4)) and Fed. R. Evid. 602).

The plaintiff insists that O'Donnell should have ordered the corrections complaint examiner to conduct further investigation into his complaint. But he does not say what that additional investigation would have uncovered, and he neither identified nor provided evidence in support of his claim that the institutional complaint examiner's investigation was inadequate. Even if he had, there is no federal constitutional right to "meaningful review of prisoner complaints," including any investigation into the allegations in a grievance. Steinke v. Dittmann, Case No. 17-cv-656, 2020 WL 470145, at *3 (E.D. Wis. Jan. 29, 2020) (quoting Reimann v. Frank, 397 F. Supp. 2d 1059, 1081 (W.D. Wis. 2005)); see also Geiger v. Jowers, 404 F.3d 371, 373 (5th Cir. 2005) (affirming denial of incarcerated person's claim that prison officials failed properly to investigate his grievances because incarcerated person had no "federally

protected liberty interest" in a certain resolution or investigation of grievances); Carlton v. Jondreau, 76 F. App'x 642, 644 (6th Cir. 2003) (affirming that prisoner did not state a claim that deputy warden "had failed to properly investigate his grievance").

The undisputed evidence shows that O'Donnell adequately reviewed the plaintiff's appeal and dismissed it based on her review of the full complaint record before her. No reasonable jury could conclude that O'Donnell violated the plaintiff's rights by disregarding or dismissing the plaintiff's appeal without reviewing his allegations or by "refusing to do her job." O'Donnell is entitled to judgment as a matter of law. The court will grant the defendants' motion for summary judgment for O'Donnell and will deny the plaintiff's motion for summary judgment.[4]

## III. Default Judgment (Dkt. No. 39)

On February 21, 2023, the court received the plaintiff's motion for default judgment under Fed. R. Civ. P. 37(b)(2)(A)(vi). Dkt. No. 39. The plaintiff recounts the discovery schedule and his requests for additional time to complete discovery because, he asserts, the defendants failed to respond to his interrogatories. Id. at ¶¶4–6. The plaintiff claims that the defendants violated the court's discovery order, and he says their "violation interferes with his thorough investigation in the discovery stage." Id. at ¶7. The plaintiff asks the court "to action [*sic*] in these

_____

[4] Because the court is granting summary judgment to defendants Hansen and O'Donnell on the merits, it will not analyze their claim that they are entitled to qualified immunity. See Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

constant violations" by entering judgment in his favor and providing him "the amount of $750,000 which they are being sued for togather [*sic*]." Id. at ¶¶9–11. He attached the interrogatories to which he claims the defendants did not respond. Dkt. No. 39-1.

As the court explained above, the parties completed discovery and filed competing motions for summary judgment. The court denied the plaintiff's motion for sanctions based on similar allegations that the defendants were violating discovery rules and failing to respond to his discovery requests. Dkt. No. 60. The plaintiff since has told the court that he had all discovery he needed and that he wanted the court "to move forward with the other motions" for summary judgment. Dkt. No. 61. The plaintiff's motion for default judgment is moot because since filing it, he has told the court that the defendants provided him all discovery he needed to prepare and file his motion for summary judgment. Even if he had not, the court previously determined that the defendants did not violate the discovery rules. For the same reasons explained in its December 29, 2022 order, the court concludes that the plaintiff is not entitled to default judgment.

## IV.  Conclusion

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 38.

The court **DENIES** the plaintiff's motion for default judgment. Dkt. No. 39.

The court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 43. The court **GRANTS** the defendants' motion for judgment in favor of defendants Dorrie Hansen and Cindy O'Donnell and **DENIES** the motion for judgment in favor of defendant Dilip Tannan.

The court **DISMISSES** defendants Dorrie Hansen and Cindy O'Donnell.

The court will issue a separate order scheduling a status conference with the plaintiff and defendant Tannan to discuss the next steps in this case.

Dated in Milwaukee, Wisconsin this 12th day of March, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**